IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

JOSEPH FIUMANO, for himself and all   :
others similarly situated,   :
      Plaintiff,   :
  :     CIVIL ACTION
    v.   :     NO. 17-465
  :
METRO DINER MANAGEMENT   :
LLC, et al.,   :
      Defendants.   :

**February 7, 2023**                                   **Anita B. Brody, J.**

<u>**MEMORANDUM**</u>

Plaintiff Joseph Fiumano, on behalf of himself and all others similarly situated, brings

this collective action against Metro Diner Management LLC, Metro Services LLC, MD Original

LLC ("MD Original"), Consul Hospitality Group LLC ("CHG"), John Davoli, Sr., and Mark

Davoli (collectively, "Defendants" or "Metro Diner") for alleged violations of the Fair Labor

Standards Act of 1938, 29 U.S.C. §§ 201 *et seq.* ("FLSA").[1]  Before the court are cross-motions

for summary judgment.

**I. BACKGROUND**

Defendants own and operate a chain of thirty Metro Diner restaurants in eight states that

employ approximately 1,450 Servers whose primary job is to wait on tables.  *See* Am. Compl.

¶ 18, ECF No. 24.  Fiumano worked full-time as a Server in Defendants' restaurants in

---

[1] Additionally, Fiumano brings claims for violation of the Pennsylvania Minimum Wage Act of 1968, 43
Pa. Cons. Stat. § 333.101 *et seq.*, and the Pennsylvania Wage Payment and Collection Law, 43 Pa. Cons.
Stat. § 260.1 *et seq.*  I exercise federal question jurisdiction over the FLSA claims pursuant to 28 U.S.C.
§ 1331, and supplemental jurisdiction over the Pennsylvania state law claims pursuant to 28 U.S.C.
§ 1367.

Altamonte Springs, Florida and Bensalem, Pennsylvania for approximately eighteen months. *See id.* ¶ 7.

On April 10, 2018, I granted Fiumano's motion for conditional certification on the FLSA claims. *See* Conditional Certification Mem., ECF No. 67; Order of Apr. 10, 2018, ECF No. 68. On June 11, 2018, I approved notice to an FLSA collective action class composed of all people who "worked as a Metro Diner Server on or after April 10, 2015." Order, ECF No. 79. Of those Servers, 245 opted into the FLSA collective action ("Plaintiffs"). On August 14, 2020, I granted final certification to the collective action class on the FLSA claims.[2] *See* Final Certification Mem., ECF No. 150; Order of Aug. 14, 2020, ECF No. 151.

Plaintiffs claim that Metro Diner violated the FLSA in two ways. First, they claim Defendants improperly paid their Servers the "tip credit" minimum wage rather than the standard minimum wage despite requiring Servers to perform non-tipped tasks for more than 20% of their work hours ("80/20 claim").[3] Second, they claim Defendants mandated Servers to pay 2% of

---

[2] Fiumano requested Rule 23 class certification only on the state law claims. I denied Fiumano's request because each opt-in Plaintiff would need an individualized determination of damages owed, failing the predominance requirement. *See* Final Certification Mem., ECF No. 150.

[3] The untipped "sidework" tasks that Servers were required to perform were listed on Metro Diner's sidework checklists as: cutting lemons; bringing PayPads out; wiping down highchairs; wiping down bottles at server side stations; changing boards from breakfast to lunch specials and from lunch to dinner specials; wiping and refilling syrups; periodically checking bathrooms for cleanliness; sweeping bathrooms, refilling paper towels, and cleaning windows; changing time labels on lemons, teas, butters, and creamers; wiping down the syrup warmer; wiping down the brass pole; cleaning the sneeze guard; refilling the ice bin; stacking cups; refilling the Walk In; folding and portioning towels; restocking everything in the front of the house, including to-go cups and boxes, the server cooler, straws, and flavored tea and coffee; spot-sweeping the dining room; sweeping floor mats; wiping down booths; resetting tables; checking tables for full sugar caddies, clean ketchups, full salt and pepper, and clean tables; checking other servers' sidework; brewing tea and coffee; icing butters, creamers, and lemons; breaking down the server station and soda machine; and cleaning coffee pots and tea urns. *See* Metro Diner Server Sidework Lists, Pls.' Mot. (Ex. 56), ECF No. 188-2. Servers described performing other sidework tasks as well, such as changing soda syrups, washing dishes, rolling silverware, turning on the syrup warmer, putting chairs down, setting up sanitary buckets, and taking out the trash. *See, e.g.*, Anderson Dep. Tr. 42:3-43:2, 60:4-24, ECF No. 142-9; Bailey Dep. Tr. 100:2-101:19, 122:21-123:7, ECF No. 142-5; Cowens Dep. Tr. 55:20-56:6, ECF No. 142-16.

their daily tips into an illegal tip pool designated for Hosts and Bussers ("tip pool claim").  On

March 16, 2022, cross-motions for summary judgment were filed.  ECF Nos. 185, 187.

In their motion for partial summary judgment, Metro Diner seeks: (1) dismissal of the

claim that Metro Diner unlawfully required Hosts and Bussers to participate in a tip pool; (2)

dismissal of all claims against John Davoli, Sr., Mark Davoli, CHG, and dismissal of some

claims against MD Original on the basis that they were not employers of Plaintiffs; and (3)

dismissal of all claims brought by the opt-in Plaintiffs who were employed at Metro Diner

locations in Nevada.  Defs.' Mot. for Partial Summ. J. ("Defs.' Mot."), ECF No. 187.

Defendants attached the declarations of Carl Sahlsten, Sr., Mark Davoli, and John Davoli, Sr. in

support of their motion.  *See* Decl. of Carl Sahlsten ("Sahlsten Decl."), ECF No. 187-3; Decl. of

Mark Davoli ("M. Davoli Decl."), ECF No. 187-4; Decl. of John Davoli, Sr. ("J. Davoli Decl."),

ECF No. 187-5.  In response, Plaintiffs filed a motion to strike the declarations, arguing that

Defendants failed to disclose the declarants as required under Federal Rule of Civil

Procedure 26.  Pls.' Mot. to Strike Ex. 1-3, ECF No. 189.  Although permitted to do so, Plaintiffs

notified the Court that they did not intend to file a sur-reply to further oppose Metro Diner's

motion for partial summary judgment.  *See* Notice of Non-Filing, ECF No. 202.

Plaintiffs moved for summary judgment in their favor on both of their FLSA collective

action claims.  Pls.' Mot. for Summ. J. ("Pls.' Mot."), ECF No. 185.  In response, Defendants

attached the declarations of thirty-five current Metro Diner Managers and Servers and responded

with their arguments articulated in their motion for summary judgment.  Defs.' Resp. in Opp'n,

ECF No. 196.  Thereafter, Plaintiffs filed a motion to strike the declarations, arguing that

Defendants again failed to disclose the declarants appropriately under Federal Rule of Civil

Procedure 26.  Pls.' Second Mot. to Strike, ECF No. 199.

I denied Plaintiffs' motions to strike the declarations and subsequently reopened discovery to give Plaintiffs the opportunity to cure the prejudice that resulted from Defendants' failure to supplement their Rule 26 disclosures as to the thirty-five Metro Diner Managers and Servers.  Order of July 7, 2022, ECF No. 210; Mem. of L., ECF No. 209.   That limited discovery is set to close on March 21, 2023.  Order of Jan. 23, 2023, ECF No. 244.  Because I denied the motions to strike the declarations, I take the declarations in consideration as part of the record in deciding the cross-motions for summary judgment.[4]

As to the tip pool claim, there is a genuine dispute of material fact on whether the inclusion of Bussers invalidates the mandatory tip pool.  As to the 80/20 claim, there is also a genuine dispute of material fact.  Therefore, I will deny Plaintiffs' motion for summary judgment on the tip pool claim.  As to the tip pool claim relating to Hosts, I will grant Defendants' motion for partial summary judgment.[5]  As to the tip pool claim relating to Bussers, I will deny Defendants' motion for partial summary judgment.  I will also deny Plaintiffs' motion on the 80/20 claim.  I will, however, grant Defendants' partial motion for summary judgment to dismiss some or all claims against CHG, MD Original, John Davoli, Sr., and Mark Davoli.  I will also grant Defendants' request to dismiss the Nevada opt-in Plaintiffs from the collective action.

## II. LEGAL STANDARD

Under Rule 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under

---

[4] I reopened discovery related to the thirty-five Managers and Servers "[t]o cure the prejudice Plaintiffs would suffer at trial as a result of Defendants' failure to supplement their Rule 26 disclosures."  Mem. of L., ECF No. 209.

[5] There is no genuine dispute of material fact as to the inclusion of Hosts, as I discuss below.

the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual

dispute is "genuine" if the evidence would permit a reasonable jury to return a verdict for the

nonmoving party. *Id.* In ruling on a motion for summary judgment, the court must draw all

inferences from the facts in the light most favorable to the nonmoving party. *Matsushita Elec.*

*Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Furthermore, "the court is

obliged to take account of the entire setting of the case on a Rule 56 motion." 10A CHARLES

ALAN WRIGHT & ARTHUR R. MILLER, ET AL., FEDERAL PRACTICE & PROCEDURE § 2721 (4th ed.

2020); *see also Brown v. Borough of Mahaffey, Pa.*, 35 F.3d 846, 850 (3d. Cir. 1994) (directing

the district court on remand to determine the issue "based on consideration of the entire

record . . . .").

     The summary judgment standard is the same for cross-motions as it is when only one

party moves for summary judgment. *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d

388, 402 (3d Cir. 2016). When facing cross-motions for summary judgment, the "court must

rule on each party's motion on an individual and separate basis, determining, for each side,

whether judgment may be entered in accordance with the Rule 56 standard." *Id.* (citations and

internal quotation marks omitted). "Both motions must be denied if the court finds that there is a

genuine dispute of material fact." 10A WRIGHT & MILLER, FEDERAL PRACTICE & PROCEDURE

§ 2720. In short, the ultimate question at summary judgment is "whether the evidence presents a

sufficient disagreement to require submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

## III. DISCUSSION

### A. FLSA Claims

Plaintiffs bring two distinct claims under the FLSA: (1) that Metro Diner required its

Servers to participate in an invalid tip pool that included Hosts and Bussers ("tip pool claim");

and (2) that Plaintiffs performed work unrelated to their tipped occupation exceeding 20% of

their time during the work week ("80/20 claim").  *See* Am. Compl. ¶¶ 16-22.  Both parties move

for summary judgment in their respective favor on Plaintiffs' tip pool claim.  Plaintiffs move for

summary judgment on their 80/20 claim.  I will address each in turn.

### a.   Tip Pool Claim

Some restaurants may require Servers to participate in a tip pool, meaning that Servers

must contribute some of the tips they earn to the other employees in the restaurant.  The Servers

are tipped employees – paid a sub-minimum hourly wage directly by their employer, the balance

of their wages is made up in the form of tips from customers.  Employers are allowed to meet

their FLSA obligation to pay their employees a minimum wage by claiming a "tip credit" for

tipped employees; the tip credit allows employers to pay their tipped employees a direct wage of

$2.13 per hour, much lower than the federal minimum wage of $7.25 per hour.  *See* U.S. DEP'T

OF LABOR, MINIMUM WAGES FOR TIPPED EMPLOYEES,

https://www.dol.gov/agencies/whd/state/minimum-wage/tipped (rev. Jan. 1, 2023).  The

employee must earn a minimum wage, so where an employer claims a tip credit, the difference is

made up through the tips the employee earns.  If the tips do not cover the difference, the

employer is responsible for making up the difference.

"An employer may not keep tips received by its employees for any purposes, including

allowing managers or supervisors to keep any portion of employees' tips, regardless of whether

or not the employer takes a tip credit."  29 C.F.R. § 203(m)(2)(B).  Tip pools are set up by

employers because they relieve them of paying full minimum wages directly to their employees,

as some portion of the tips are expected to make up the difference.[6]  Metro Diner claims a tip

credit and subjects Servers to a mandatory tip pool arrangement.  Defendants do not dispute that

Metro Diner has a company-wide policy of requiring Servers to contribute 2% of their daily sales

into a tip pool for Hosts and Bussers.  *See* Defs.' Mot. 5.  Defendants move for summary

judgment in their favor arguing that Metro Diner's mandatory tip pool arrangement is valid

because Hosts and Bussers are tipped employees.  Plaintiffs independently move for summary

judgment in their favor that Bussers are not tipped employees, and their inclusion in the

mandatory tip pool therefore makes the tip pool illegal.

      Whether the tip pool is valid turns on the question of whether Metro Diner Hosts and

Bussers are tipped employees.  If an employee is engaged in a tipped occupation in the course of

their work, then their inclusion in a mandatory tip pool is legal.  The FLSA prohibits employers

from retaining any part of the tips received by an employee from customers, but expressly

permits "the pooling of tips among employees who customarily and regularly receive tips."  29

U.S.C. § 203(m)(2)(A).  Section 203(t) of the FLSA clarifies that a tipped employee is an

employee who is "engaged in an occupation in which he customarily and regularly receives more

than $30 a month in tips."  29 U.S.C. § 203(t).  "The phrase 'customarily and regularly' signifies

---

[6] Tip pools may either be mandatory or voluntary.  29 C.F.R. § 531.54.  There are two types of mandatory tip pools: (1) where an employer claims a tip credit, and (2) where an employer does not claim a tip credit, and instead pays tipped employees a full minimum wage.  *Id.* §§ 531.54(c)-(d).  Where an employer claims a tip credit and sets up a tip pool arrangement requiring tipped employees to participate, that mandatory tip pool may only include tipped employees, *i.e.* those who customarily and regularly receive at least $30 in tips per month.  *See id.*  Where an employer does not claim a tip credit, and tipped employees are paid the full minimum wage, that mandatory tip pool may include employees who do not customarily and regularly receive tips.  *See id.*  Employers may never participate in a tip pool.  *Id.* §§ 531.54(c)(3), 531.54(d).  Voluntary tip pools, where employees set up the tip pool arrangement, may include both tipped and non-tipped employees.  *See* U.S. Dep't of Labor, Field Operations Handbook § 30d04(g) (rev. Dec. 15, 2016).  Employers are not allowed to participate in the tip distribution or the development of the arrangement; it must be truly voluntary and free from coercion.  *See id.*  Employers may also not claim the tips distributed in a voluntary tip pool as a tip credit.  *Id.*

a frequency which must be greater than occasional, but which may be less than constant."  29

C.F.R. § 531.57.  The regulation further provides that an "employer may require those [tipped]

employees to participate in a tip pool with other tipped employees that customarily and regularly

receive tips."  *Id.* § 531.50.  "Where employees practice tip splitting, as where waiters give a

portion of their tips to the busboys, both the amounts retained by the waiters and those given the

busboys are considered tips of the individuals who retain them, in applying the provisions of

section 3(m) and 3(t)," which are the sections that permit tip-pooling for employees who

regularly and customarily receive more than $30 a month in tips.  *Id.* § 531.54.  At the same

time, "[o]nly tips actually received by an employee as money belonging to the employee may be

counted in determining whether the person is a 'tipped employee' within the meaning of the Act

and in applying the provisions of section 3(m) which govern wage credits for tips."  *Id.* § 531.52.

Although the Third Circuit has not spoken directly on the question of how to define who

qualifies as a tipped employee, other circuit courts have laid out important principles to guide

courts' analysis.  While tipped employees need not receive tips directly from customers, "[i]t

would be circular to find that" merely being included in a mandatory tip pool means an employee

"customarily and regularly received tips."  *Montano v. Montrose Rest. Assocs., Inc.*, 800 F.3d

186, 189 (5th Cir. 2015).  "This would allow a restaurant to designate any employee it wished as

a tipped employee . . . as long as it made that employee part of a mandatory tip pool and the

waiter's retained tips plus the waiter's $2.13 salary exceeded the general minimum wage."  *Id.*

Qualifying as a tipped employee requires something more than inclusion in a mandatory tip pool.

Whether an employee "customarily and regularly receive[s] tips" and can legally

participate in the tip pool is a question of fact.  *Fiumano v. Metro Diner Mgmt. LLC*, No. CV 17-

465, 2018 WL 1726574, at *5 (E.D. Pa. Apr. 10, 2018) (citing *Montano*, 800 F.3d at 193

("Determining whether an employee is one who 'customarily and regularly receives tips' is a fact-intensive inquiry that requires a case-by-case analysis of the employee's duties and activities.")).  Factfinders may consider various duties and activities of employees to resolve this inquiry such as the employee's level of interaction with customers and whether the employee performed customer service functions.  *See Montano*, 800 F.3d at 193 ("[I]n determining whether an employee customarily and regularly receives tips, a court—or a factfinder—must consider the extent of an employee's customer interaction . . . [and] whether the employee is engaging in customer service functions.").  The Fifth Circuit justified this rule by emphasizing that tips are defined based on customer intent.  *See Montano,* 800 F.3d at 193.  The Department of Labor ("DOL") defines a tip as "a sum presented by a customer as a gift or gratuity in recognition of some service performed for him."  29 C.F.R. § 531.52.  Because restaurant tips are undesignated, at any given point in time, customers may be tipping for any and all customer service they receive and not just service performed by their waiters.  To qualify as a tipped employee, one's level of customer interaction need not be extensive; it must be "more than *de minimis*" for an employee to be engaged in a tipped occupation.  *Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301 (6th Cir. 1998) (italics added); *Ford v. Lehigh Valley Rest. Grp., Inc.*, No. 3:14CV227, 2014 WL 3385128, at *4 (M.D. Pa. July 9, 2014).

Defendants argue that Hosts and Bussers are tipped employees within the meaning of the FLSA and that Metro Diner's tip pool arrangement was therefore legally valid.  *See* Defs.' Mot. 5-18.  Plaintiffs argue only that Bussers are not tipped employees because of their only *de minimis* customer interaction.  *See* Pls.' Mot. 3-12.  Because Plaintiffs do not dispute that Hosts interact with customers by greeting them, among other responsibilities,[7] and do not argue on

---

[7] Plaintiffs state that they "concede these facts as undisputed" in response to Defendants' statement of undisputed facts regarding Hosts' responsibilities: "Hosts are responsible for greeting guests, seating

summary judgment that the inclusion of Hosts in the tip pool arrangement violates the FLSA, I

find that there is no genuine dispute of material fact as to whether Metro Diner Hosts are tipped

employees validly included in the mandatory tip pool.

       The only remaining question is whether Metro Diner Bussers were engaged in a tipped

occupation in the course of their work to qualify as tipped employees, making their inclusion in

the mandatory tip pool arrangement legal.  Plaintiffs offer interrogatories, sworn declarations,

and depositions attached to their motion for summary judgment to establish that Bussers do not

interact with customers and sometimes do not even "pre-buss" tables, *i.e.* clear tables while the

customers are still seated.  *See e.g.,* Anderson Dep. 93:6-93:12, ECF No. 185-35; Bailey Dep.

85:5-85:16, ECF No. 185-36; Baughman Dep. 37:2-38:6, ECF No. 185-37; Boone Dep. 35:10-

36:2, ECF No. 185-38; Burley Dep. 114:22-114:25, ECF No. 185-39; Clement Dep. 26:10-

26:24, ECF No. 185-40; Cowens Dep. 116:10-116:19, ECF No. 185-41; Kamajian Dep. 23:4-

23:14, ECF No. 185-44; Knight Dep. 96:24-97:4, ECF No. 185-45; Miller Dep. 40:7-41:20, ECF

No. 185-46; Nelson Dep. 60:2-60:12, ECF No. 185-47; Rodriguez Dep. 122:2-122:25, ECF No.

185-50, Schoedel Dep. 37:2-38:7, ECF No. 185-51; Zimmer Dep. 112:23-115:21, ECF No. 185-

55.  Defendants offer sworn declarations by Metro Diner Managers and Servers, and references

to Plaintiff depositions, to show that Bussers are largely server helpers, involved with pre-

bussing and clearing tables once customers have left.  *See e.g.,* Pitts Decl. ¶ 17, ECF No. 196-5;

Haack Decl. ¶ 17, ECF No. 196-31; Lomuscio Decl. ¶ 17, ECF No. 196-8; Jones Decl. ¶ 16, ECF

No. 196-23; Pereira Decl. ¶ 14, ECF No. 196-12; Nugent Decl. ¶ 21, ECF No. 196-21; Wade

---

guests, and handling guest questions and complaints . . . Hosts routinely interact with guests to answer
questions, update the guests on wait times, provide menus, and provide coffee, tea, or water to guests
during the wait."  Pls.' Resp. in Opp'n to Defs.' Mot., Pls.' Statement of Genuine Issues ¶ 10, ECF No.
195.

Decl. ¶ 14, ECF No. 196-14; Walker Decl. ¶ 15, ECF No. 196-26; Martin Decl. ¶¶ 18-19, ECF No. 196-16; Glines Decl. ¶ 17, ECF No. 196-11; Abdelaal Decl. ¶ 17, ECF No. 196-20; McGuire Decl. ¶ 15, ECF No. 196-25; Corbett Decl. ¶ 18, ECF No. 196-37; Traxler Decl. ¶ 19, ECF No. 196-28; Moore Decl. ¶ 19, ECF No. 196-19; Finley Decl. ¶ 14, ECF No. 196-33; Rusk Decl. ¶ 16, ECF No. 196-7; Marchbanks Decl. ¶ 20, ECF No. 196-36; Ledford Decl. ¶ 18, ECF No. 196-15; Martin Decl. ¶ 18, ECF No. 196-16; Thompson Dep. 46:7-47:8, ECF No. 187-15; Kamajian Dep. 22:6-25:15, ECF No. 187-16; Zimmer Dep. 49:15-50:16, ECF No. 187-10. Defendants also cite to the inclusion of "busboys" in the DOL regulations as an example of a traditionally tipped employee, "bussers" in the Field Handbook recognizing them as employees customarily and regularly receiving tips, and bussers' responsibilities as detailed in the DOL regulations. *See* 29 C.F.R. § 531.54; U.S. Dep't of Labor, Field Operations Handbook § 30d04(a) (rev. Dec. 15, 2016) ("Field Handbook"); 29 C.F.R. § 531.56.

    Both summary judgment motions are plausibly supported by the declared experiences of staff at Metro Diner restaurants, presenting a genuine dispute of fact.  While Bussers have been recognized by the DOL as engaged in a tipped occupation, this is a facts-specific inquiry that turns on the duties and activities of employees on the job rather than job title alone.  *See Montano*, 800 F.3d at 191 ("[O]ne's status as an employee who 'customarily and regularly receives tips' is 'determined on the basis of his or her activities,' not on the employee's job title.") (internal citations omitted).  Allowing employers to shirk their obligation under the FLSA to pay a minimum wage to their employees just by conferring a job title that denotes a tipped occupation would circumvent the purpose of the FLSA.

    A determination on this fact is "material" to the legal question of whether Bussers qualify as tipped employees under the FLSA because a more than *de minimis* level of customer

interaction and/or performance of customer service functions is required for Bussers to be considered tipped employees.  As a result, a reasonable juror could conclude based on the evidence presented by both parties that Metro Diner Bussers' level of interaction with customers/performance of customer service functions is not more than *de minimis*.

As to the tip pool claim relating to Hosts, I will grant Defendants' motion for partial summary judgment because there is no genuine dispute of material fact.  As to the tip pool claim relating to Bussers, because there is a genuine dispute of material fact, I will deny the cross-motions for summary judgment on whether the mandatory tip pool including Bussers is valid under the FLSA.

### b.  80/20 Claim

As I discussed above, the "tip-credit" minimum wage is an alternative to the ordinary federal minimum wage available for certain tipped jobs.  The FLSA ordinarily requires employers to pay a minimum hourly wage, which is currently $7.25 per hour.  29 U.S.C. § 206(a)(1)(C).  However, the FLSA allows an employer, under certain circumstances, to use the tips of a "tipped employee" to meet its minimum wage obligations.  The FLSA provides:

> In determining the wage an employer is required to pay a tipped employee, the amount paid such employee by the employee's employer shall be an amount equal to—
>> (i) the cash wage paid such employee which for purposes of such determination shall be not less than the cash wage required to be paid such an employee on August 20, 1996 [$2.13]; and
>> (ii) an additional amount on account of the tips received by such employee which amount is equal to the difference between the wage specified in clause (i) and the wage in effect under section 206(a)(1) of this title [$7.25].
> The additional amount on account of tips may not exceed the value of the tips actually received by an employee. The preceding 2 sentences shall not apply with respect to any tipped employee unless such employee has been informed by the employer of the provisions of this subsection, and all tips received by such employee have been retained by the employee, except that this subsection shall not be construed to prohibit the pooling of tips among employees who customarily and regularly receive tips.

12

29 U.S.C. § 203(m)(2)(A).

Therefore, the FLSA allows employers to pay a "tipped employee" a cash wage of $2.13 per hour provided that the employee's tips make up the difference between the $2.13 cash wage and the current federal minimum wage.  *See* 29 U.S.C. § 203(m).  The difference between the cash wage and the federal minimum wage is known as the "tip credit."  *See* 29 C.F.R. § 531.56(d).

The DOL recognizes that an employee may be engaged in two occupations for the same employer but may only qualify as a "tipped employee" in one of those occupations.  *See* 29 C.F.R. § 531.56(e) ("Dual Jobs Regulation").  In this situation, the tip credit may only be taken for the employee's hours spent in the occupation for which he qualifies as a "tipped employee." *See id.*  The Dual Jobs Regulation states:

> In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables, toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

*Id.*

The Dual Jobs Regulation is interpreted according to a principle known as the "80/20 Rule."[8]  *See* 20 C.F.R. § 531.56(e); *see also Belt v. P.F. Chang's China Bistro, Inc.*, 401 F. Supp. 3d 512, 535 (E.D. Pa. 2019) (interpreting the Dual Jobs regulation and holding that "when an

---

[8] The final 80/20 Rule went into effect on December 28, 2021.  20 C.F.R. § 531.56.

employee spends more than 80 percent of his or her time performing tipped work—and less than twenty percent of his or her time performing untipped related work—the employee is a "tipped employee" for all of his or her hours . . . ." and "[when that] employee spends more than twenty percent of his or her time performing untipped related work, they are no longer a tipped employee during any of the time they spend performing untipped related work.").   Under the 80/20 Rule, an employer may never take any tip credit for time an employee spent performing untipped work that is *not part of* the tipped occupation; *i.e.*, work that is either tip-producing or directly supporting the tip-producing work.  *See* 20 C.F.R. § 531.56(f)(1); *see also Belt*, 401 F. Supp. 3d at 522.  Additionally, an employer may only take a tip credit for time an employee spends performing *related*, but untipped, duties if the employee spends twenty percent or less of their time performing related duties.  *Belt*, 401 F. Supp. 3d at 522.  Under the 80/20 Rule:

> [A] server who spent two hours or less filling salt shakers during a ten hour shift, and who spent the remainder of his or her shift waiting on customers, could be paid $2.13 an hour for all of the hours he or she worked.  But a server who spent more than two hours filling salt shakers and performing other related untipped work would be engaged in dual jobs, and must be paid the full minimum wage for all hours spent performing related untipped work.

*Id.*

Plaintiffs argue that they are entitled to summary judgment that Defendants violated the 80/20 Rule by requiring Plaintiffs to "consistently perform excessive untipped sidework."  Pls.' Mot. 1.  They submit interrogatories and sworn declarations that show Servers routinely spent over twenty percent of their shifts, and sometimes even half of their shifts, performing untipped sidework.  *See e.g.,* Brugger Interrog. 4, ECF No. 185-5; Fiumano Interrog. 4, ECF No. 185-6; Levin Interrog. 4, ECF No. 185-7; Schmitz Interrog. 4, ECF No. 185-8; Toney-Fine Interrog. 4, ECF No. 185-9; Anderson Decl. ¶ 8, ECF No. 185-10.  Defendants respond with twenty-six sworn declarations by Servers stating they spent less than twenty percent of their hours

performing sidework.  *See e.g.,* Abdelaal Decl. ¶ 7, ECF No. 196-20; Allen Decl. ¶ 15, ECF No.

196-32; Bolena Decl. ¶ 16, ECF No. 196-27; Brown Decl. ¶ 14, ECF No. 196-30; Corbett Decl.

¶ 5, ECF No. 196-37; Dickerson Decl. ¶ 13, ECF No. 196-22; Finley Decl. ¶ 4, ECF No. 196-33;

Glines Decl. ¶ 7, ECF No. 196-11.  These disparate accounts, supported by sworn statements and

affidavits, create a genuine dispute of material fact as to how much time Servers spent

performing sidework that was not directly supporting tip-producing work.  For this reason, I will

deny summary judgment to Plaintiffs on their 80/20 claim.

### B.  Joint Employer and Individual Liability Under the FLSA

Defendants argue that some or all claims against CHG, MD Original, John Davoli, Sr.,

and Mark Davoli should be dismissed because these defendants cannot be held liable as

employers under the FLSA.

Employers may be held liable for FLSA violations if they have "an actionable employer-

employee relationship" with the complainants.  *Thompson v. Real Estate Mortg. Network*, 748

F.3d 142, 148 (3d Cir. 2014).  An employer is defined in the FLSA as "any person acting directly

or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d).  The

FLSA's definition of an employer is "the broadest definition that has ever been included in any

one act."  *United States v. Rosenwasser*, 323 U.S. 360, 363 n.3 (1945).  An employee is defined

as "any individual employed by an employer."  29 U.S.C. § 203(g).  Where multiple employers

are alleged to have violated the FLSA, but only one of the employers directly employs the

employee, "multiple persons or entities can be responsible for a single employee's wages as

'joint employers' in certain situations."  *Thompson*, 748 F.3d at 148; *see* 29 C.F.R. § 791.2.[9]  "A

---

[9] 29 C.F.R. § 791.2 has been rescinded and reserved, effective September 28, 2021.  *See* 86 Fed. Reg.
40,939 (July 30, 2021).  The rescission of the rule referenced the DOL's longstanding guidance
establishing potential liability for multiple employers under a joint employment theory that eventually led
to the practice being codified in the Code of Federal Regulations.  *See* 86 Fed. Reg. 40,939 (July 30,

determination of whether the employment by the employers is to be considered joint employment or separate and distinct employment for purposes of the act depends upon all the facts in the particular case."  29 C.F.R. § 791.2(a).

The Third Circuit articulated the joint employer test in *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 683 F.3d 462 (3d Cir. 2012).  To evaluate whether an employee exercises "significant control" rising to the level of a joint employer, a court must consider:

> 1) the alleged employer's authority to hire and fire the relevant employees; 2) the alleged employer's authority to promulgate work rules and assignments and to set the employees' conditions of employment: compensation, benefits, and work schedules, including the rate and method of payment; 3) the alleged employer's involvement in day-to-day employee supervision, including employee discipline; and 4) the alleged employer's actual control of employee records, such as payroll, insurance, or taxes.

*Id.* at 469.  Importantly, these facts are not to be "blindly applied . . . If a court concludes that other indicia of 'significant control' are present to suggest that a given employer was a joint employer of an employee, that determination may be persuasive, when incorporated with the individual factors . . . ."  *Id.* at 469-70.  If multiple employers exercise significant control over the employee, "each joint employer may be held jointly and severally liable for the FLSA violations of the other, in addition to direct liability for its own violations."  *Thompson*, 748 F.3d at 148.

---

2021) (discussing prior guidance beginning in 1939 and the first iteration of the rule published in 1958). However, district courts have continued to follow Third Circuit rulings applying the regulation under the FLSA.  *See Knight v. Pub. Partnerships, LLC*, No. CV 19-2461, 2021 WL 4709683, at *3 (E.D. Pa. Oct. 7, 2021); *Nagel v. RAM Indus. Servs.*, No. 1:20-CV-840, 2022 WL 17721083, at *8 (M.D. Pa. July 21, 2022), report and recommendation adopted sub nom. *Nagel v. RAM Indus. Servs., LLC*, No. 1:20-CV-00840, 2022 WL 17721078 (M.D. Pa. Aug. 8, 2022); *Xiao v. Sichuan Gourmet LLC*, No. 2:21-CV-00482, 2022 WL 819096, at *3 (W.D. Pa. Mar. 18, 2022).  Both the equitable principles underlying the Third Circuit precedent in *Thompson* and *In re Enterprise Rent-A-Car Wage & Hour Employment Practices Litigation*, 683 F.3d 462 (3d Cir. 2012) and the longstanding position of the DOL to find joint employer liability are based on the FLSA's definition of an "employer" and guide the court's analysis.

Both corporate entities and "a company's owners, officers, or supervisory personnel" may be liable as joint employers under the FLSA. *Id.* at 153. An individual is subject to FLSA liability when, in addition to the *Enterprise* test, "'he or she exercises 'supervisory authority over the complaining employee and was responsible in whole or part for the alleged violation' while acting in the employer's interest.'" *Id.* (quoting *Haybarger v. Lawrence County Adult Prob. & Parole*, 667 F.3d 408, 417 (3d Cir. 2012) and applying its analysis under the Family and Medical Leave Act to the FLSA context) (internal citations omitted). This inquiry focuses on "the totality of the circumstances rather than on technical concepts of the employment relationship." *Id.* at 154 (internal citations omitted). An individual supervisor's control over an employee under the FLSA serves as "the 'economic reality' of the employment situation, examining whether the individual supervisor carried out the functions of an employer with respect to the employee." *Haybarger*, 667 F.3d at 417 (internal citations omitted).

### a. CHG

CHG is a Florida company "formed to hold ownership interests in restaurant concepts." Sahlsten Decl. ¶ 5. Plaintiffs allege that CHG "owns and operates Metro Diner restaurants in Bensalem, PA and York, PA, and . . . at least 20 more Metro Diner restaurants in Florida (13), Georgia (1), Indiana (3), North Carolina (2) and Virginia (1)." Am. Compl. ¶ 11. Defendants rely primarily on the Sahlsten Declaration, a sworn statement by Carl Sahlsten, the current Chief Executive Officer of Metro Diner, LLC and a Manager of CHG and MD Original, to establish that CHG did not exercise significant control over Metro Diner Servers.

According to Sahlsten, "[i]n our organizational structure, CHG sits four levels above any business entity that owns and operates a Metro Diner restaurant." Sahlsten Decl. ¶ 14. The facts as presented by Sahlsten that are relevant to the *Enterprise* test are: (1) "CHG has never been

involved in the hiring and firing of servers at Metro Diner restaurants"; (2) "CHG has never had the authority to enforce work rules, set work assignments, set wage rates, benefits, and/or schedule hours for servers at any Metro Diner restaurants"; (3) "CHG has never had the authority to supervise servers . . . It does not provide servers with work assignments, offer instruction, address server complaints, or evaluate the server's worker performance"; and (4) "CHG has never had control of any employee records of any servers employed at Metro Diner restaurants." Sahlsten Decl. ¶¶ 15-18.  Defendants also point to Plaintiffs' depositions to show that managing partners at the individual diners were responsible for hiring and firing decisions, instead of CHG. *See* Fiumano Dep. 22:17-23:17, ECF No. 187-7 (recalling that the kitchen manager, Richard Horwith, called Fiumano about a server position and interviewed him for it); *see also* Nelson Dep. 20:6-20:15, 40:17-41:15, ECF No. 187-11 (recalling that Nelson interviewed with the general manager of the Metro Diner restaurant she worked at, who was named Mark, and that she was fired after a difference of opinion with John, a traveling manager); *see also* Knight Dep. 15:17-16:15, ECF No. 187-9 (recalling that Knight was hired by "a salaried manager" named Johnny at the Raleigh restaurant and Kenny Voight who was a manager at the Pineville restaurant).

Plaintiffs attempt to respond to the evidence presented by Defendants in their statement of undisputed facts.  Plaintiffs point to the allegations in the Amended Complaint: "CHG owns and operates Metro Diner restaurants in Bensalem, PA and York, PA and, as of March 8, 2017, at least 20 more Metro Diner restaurants in Florida (13), Georgia (1), Indiana (3), North Carolina (2) and Virginia (1)."  *See* Pls.' Resp. in Opp'n to Defs.' Mot., Pls.' Statement of Genuine Issues ¶¶ 5, 7-8, ECF No. 195.

Applying the *Enterprise* test, I find that CHG did not exercise sufficient control to

constitute joint employment.  First, as Sahlsten stated and as confirmed by the experiences of

Plaintiffs hired at a Metro Diner restaurant, CHG did not have authority to hire employees.  That

authority was vested in and exercised by local or traveling managers who called, interviewed,

and spoke with Servers directly.  *See e.g.,* Baughman Dep. 13:3-14:23, ECF No. 185-37

(referring to an assistant manager and general manager hiring her and calling them her "direct

supervisor"); Boone Dep. 10:21-11:10, ECF No. 185-38 (noting she was hired by the manager

who interviewed her).  In terms of firing employees, discussion about the rationale behind

termination also occurred with local managers.  Nelson Dep. 45:13-47:15, ECF No. 185-47 ("I

asked Kevin [about termination].  He was key manager . . . I just asked Kevin, hey, is everything

okay?  And he was like, well, you never called.").  Second, there is no mention in the record as

to CHG's involvement in setting workplace guidance, except by Sahlsten stating their lack of

involvement and authority to do so.  Sahlsten Decl. ¶ 16.  Third, CHG was not involved in day-

to-day supervision of employees or employee discipline.  Sahlsten Decl. ¶ 17.  The Metro Diner

Employee Handbook specifically leaves employee discipline to "Metro Diner's sole discretion"

and makes no mention of CHG.  *See* Metro Diner Employee Handbook 7, Pls.' Mot. (Ex. 58)

("Employee Handbook"), ECF No. 185-61.  Fourth, CHG had no control over employee records

which were maintained locally, on-site.  Sahlsten Decl. ¶ 18,

Under Rule 56, summary judgment motions may be opposed "by any of the kinds of

evidentiary materials listed in Rule 56(c), *except the mere pleadings themselves*."  *Celotex Corp.

v. Catrett*, 477 U.S. 317, 324 (1986) (italics added).  Plaintiffs fail to point to any evidentiary

materials in the record to oppose Defendants' motion to dismiss CHG as a defendant beyond the

mere pleadings.  As a result, Defendants succeed in showing that there is an absence of evidence

to support CHG's inclusion in this case as a joint employer.  I will grant their request for partial

summary judgment to dismiss claims against CHG.

### b.  MD Original

MD Original is a Florida company with "an ownership interest over the subsidiary LLCs that own and operate three restaurant locations."  Sahlsten Decl. ¶ 19.  MD Original was created by the founders of Metro Diner and CHG to serve as the owner of the three existing Metro Diner restaurants at the time.  *Id.* ¶¶ 8, 19.  When Metro Diner expanded and ten additional restaurants were developed, two additional limited liability companies were created to own and operate the new restaurants, MD Development LLC and MD Development 2 LLC.  *Id.* ¶¶ 27-28.  As a result, Defendants argue that MD Original's only liability as an employer must be assessed in relation to the original three restaurants in which it held an ownership interest because it has never been related to the ten additional restaurants.[10]

Defendants argue that claims raised by Plaintiffs who were employed in the ten original restaurants with which MD Original had no relationship should be dismissed as against MD Original.  The facts as presented by Sahlsten as relevant to the application of the *Enterprise* test are: (1) "Neither CHG nor MD Original were involved in the day-to-day operations of the Hendricks, Mandarin, or Roosevelt diners" (*i.e.*, the three original Metro Diner restaurants in which MD Original had an ownership interest); (2) "[MD Original] does not have an ownership interest in any other LLCs or any other Metro Diner locations"; (3) MD Original is not involved on a day-to-day basis in the hiring and firing of any servers at any Metro Diner locations"; (4) "MD Original is not directly involved in enforcing work rules that apply to servers at any Metro Diner locations . . . setting wage rates or creating work schedules for servers employed at any

---

[10] Defendants admitted that MD Original meets the FLSA statutory definition of "employer" in their Answer to the Amended Complaint.  ECF No. 28.  Defendants now submit that this was in relation to authority over the three original Metro Diner restaurants.  *See* Defs.' Mot. 22.

Metro Diner locations"; (5) "[i]n May 2014, MD Original began relying on Choice HR, an employee leasing company, to serve as the employer of record for the employees working at the Hendricks, Mandarin, and Roosevelt Metro Diner locations"; (6) "[o]n a regular basis, MD Original wired funds to Choice HR to cover the payroll costs of these employees"; (7) "MD Original did not have actual control over [payroll records and other records] – it would have had to request copies from Choice HR if it needed them for any reason"; (8) "MD Original does not have any ownership interest over those additional ten Metro Diner locations. It does not have any control over those employees, nor does it participate in the day-to-day management of those ten additional Metro Diner locations."  Sahlsten Decl. ¶¶ 12, 19-25, 29.

MD Original qualifies as a joint employer for employees working at the original three Metro Diner restaurants as its owner.[11]  The only remaining question is MD Original's status as a joint employer for the remaining ten Metro Diner restaurants.

Applying the *Enterprise* test, I find that without an ownership interest in a restaurant, MD Original does not qualify as a joint employer for employees who worked at the ten additional Metro Diner restaurants.  First, no evidence in the record points to any entity's retained authority to enter into contractual agreements to hire employees by anyone other than the Owner of the restaurant, or that anyone other than local managers specifically conducted hiring.  *See* Employee Handbook 28 ("No representative of Metro Diner aside from the Owner has authority to enter into any agreement contrary to the 'employment at will' relationship").  Further, no evidence in the record points to any entity other than the local managers being involved in termination of employees.  Plaintiffs do not present evidence to challenge the description of MD

---

[11] Defendants concede that MD Original is likely an employer, given its ownership interest, of the employees at the three original Metro Diner restaurants.  *See* Defs.' Mot. 23; *see also* Answer to Am. Compl. ¶ 36, ECF No. 28.

Original's relationship to the various Metro Diner restaurants submitted by Sahlsten; instead, they refer back to a generalized statement that "MD Original LLC . . . is a corporation incorporated in the State of Florida that owned, operated and served as the operational entity for the first ten Metro Diner restaurants until the formation of Metro Diner Management, LLC in late 2015." Pls.' Resp. in Opp'n to Defs.' Mot., Pls.' Statement of Genuine Issues ¶¶ 4, 5, 7, ECF No. 195. This is a verbatim reference to the Amended Complaint, which again is insufficient to support an opposition to a motion for summary judgment as a reference back to the "mere pleadings." *Celotex*, 477 U.S. at 324. Second, Plaintiffs do not respond to the assertion that MD Original had no role in setting work rules, assignments, or conditions for employment in the ten additional Metro Diner restaurants; the record is bereft of any references to MD Original executives or managers being involved in defining these critical workplace requirements for these locations. Third, outside from its ownership of the three original Metro Diner restaurants, MD Original had no day-to-day supervision or disciplinary authority over employees at the ten additional locations. Sahlsten Decl. ¶ 20. Fourth, employee records were maintained at the individual locations and through Choice HR – for the ten additional locations, MD Original had no access to or control over employee records. Sahlsten Decl. ¶ 23-25. Fifth, Plaintiffs point to no other indicia of significant control by CHG over Servers. The *Enterprise* factors therefore weigh in favor of dismissing claims brought against MD Original by Plaintiffs employed in the ten additional Metro Diner restaurants. I will grant Defendants' request for summary judgment on this question.

### c.  John Davoli, Sr. and Mark Davoli

John Davoli, Sr. and Mark Davoli are the entrepreneurs behind Metro Diner, after Mark and John Davoli, Jr. acquired the original Hendricks location in 2000. M. Davoli Decl. ¶ 2; J.

Davoli Decl. ¶ 2.  John Davoli, Sr., their father, joined in developing the concept in 2001 and

they expanded Metro Diner together to the Mandarin and Roosevelt locations.  M. Davoli Decl.

¶¶ 3, 5; J. Davoli Decl. ¶ 3, 5.  In 2014, the Davolis distanced themselves from management of

the Metro Diner restaurants they opened by forming DFC-MD, LLC which then partnered with

CHG to continue expanding Metro Diner.  M. Davoli Decl. ¶¶ 6-8; J. Davoli Decl. ¶¶ 6-8.  Upon

this shift in ownership, the Davolis' stepped away from day-to-day supervision of Servers, hiring

employees, and setting wages and workplace conditions.  M. Davoli Decl. ¶ 9; J. Davoli Decl.

¶ 9.  Mark Davoli stated that for each restaurant, these decisions were made by a "managing

partner."  M. Davoli Decl. ¶ 10.  The Davolis were not involved in any of the supervision of the

ten additional Metro Diner restaurants as Metro Diner expanded.  M. Davoli Decl. ¶¶ 12-15; J.

Davoli Decl. ¶¶ 13-15.  Finally, the Davolis state that they do not possess or control employment

or personnel records of employees in restaurants in which their company, DCF-MD, LLC, holds

an ownership interest.  M. Davoli Decl. ¶ 16; J. Davoli Decl. ¶ 16.

    In order to subject an individual to FLSA liability as an employer, the individual must

exercise supervisory authority over the employee under *Haybarger* and *Enterprise*.  Here, the

facts fail to establish that John Davoli, Sr. or Mark Davoli ever exercised supervisory authority

over employees at the ten additional Metro Diner restaurants.[12]  As to the three original Metro

Diner restaurants, any control and supervisory authority over employees lapsed in 2014, which

precedes the collective action period.  Plaintiffs point to no evidence in the record that the

Davolis were involved in supervision of employees, or that Servers were familiar with the

Davolis beyond setting up the original workplace policies that have since been superseded by

---

[12] Additionally, Defendants denied the allegation that John Davoli, Sr. and Mark Davoli were employers
under the FLSA.  *See* Answer to Am. Compl. ¶ 38, ECF No. 28.

new managers.

Plaintiffs once again refer to allegations in the Amended Complaint to dispute the

representations made in both declarations by the Davolis, stating:

> During the relevant period, John Davoli, Sr. has been involved in the day-to-day business operation of Metro Diner, exercised operational control over Metro Diner and controlled significant business functions of Metro Diner, including: determining employee salaries, making hiring decisions, controlling corporate checking and payroll accounts and acting for Metro Diner to devise, direct, implement and supervise the wage and hour policies and practices challenged in this action.

Pls.' Resp. in Opp'n to Defs.' Mot., Pls.' Statement of Genuine Issues ¶¶ 3, 8, ECF No. 195.

Plaintiffs further note that:

> Mark Davoli is a co-owner and operator of Metro Diner Management LLC, Metro Services LLC, and MD Original LLC.  During the relevant period, Mark Davoli has been involved in the day-to-day business operation of Metro Diner, exercised operational control over Metro Diner and controlled significant business functions of Metro Diner, including: determining employee salaries, making hiring decisions, controlling corporate checking and payroll accounts and acting for Metro Diner to devise, direct, implement and supervise the wage and hour policies and practices challenged in this action.[13]

*Id.*  These references to the mere pleadings are insufficient to oppose Defendants' proffered

evidence in the form of affidavits and fail to establish a genuine dispute of material fact as to the

Davolis' supervisory authority over Metro Diner employees.  As a result, evidence presented by

the Defendants is so one-sided as to conclude that the Davolis were not employers under the

FLSA to employees bringing this collective action.  I will grant Defendants' motion for partial

summary judgment to dismiss claims against John Davoli, Sr. and Mark Davoli.

### C.  Nevada Plaintiffs

---

[13] Plaintiffs also cite to the "Metro Diner's History" section of the Employee Handbook to establish these claims from their Amended Complaint, but the representations in that section do not support the generalized assertion Plaintiffs make in the Amended Complaint.  *See* Pls.' Resp. in Opp'n to Defs.' Mot., Pls.' Statement of Genuine Issues ¶ 3, ECF No. 195.

Defendants also argue that claims brought by six[14] opt-in Plaintiffs who worked in Nevada should be dismissed because Nevada state law prevents Plaintiffs from establishing that these Nevada opt-in Plaintiffs were paid the tip credit minimum wage.[15]  In order to establish a *prima facie* FLSA claim under the 80/20 Rule and to challenge the tip pool arrangement, Plaintiffs must show that Metro Diner took a tip credit to meet its minimum wage obligations to these Plaintiffs.  If Metro Diner did not take a tip credit to pay these Plaintiffs the minimum wage under the FLSA, then these Plaintiffs could not allege FLSA violations.

Defendants point to the existence of a Nevada state law to show that Plaintiffs fail to establish an element essential to their case: that Metro Diner took a tip credit to meet its minimum wage obligations to these Plaintiffs.  Nevada state law provides that employers may not "[a]pply as a credit toward the payment of the statutory minimum hourly wage established by any law of this State any tips or gratuities bestowed upon the employees of that person."  N.R.S. 608.160(b).  Nevada has placed a ban on employers against using tip credits to satisfy its payment obligations to employees.  Defendants argue that during the collective action period, employers were required to comply with Nevada law that ensured employees were paid a state minimum wage of either $7.25 for employees offered qualified health benefits (matching the

---

[14] Parties stipulated to dismissing eleven opt-in Plaintiffs on March 7, 2022 prior to the filing of Defendant's motion for partial summary judgment on March 16, 2022.  *See* Joint Stipulation of Dismissal and Order, ECF No. 184.  I ordered those Plaintiffs dismissed on August 22, 2022.  Order, ECF No. 218. Accordingly, though the motion for partial summary judgment identified seven opt-in Plaintiffs who worked in Nevada that Defendants argue should be dismissed, I only consider dismissal of the six remaining opt-in Plaintiffs because Stephanie Prince was dismissed.

[15] Plaintiffs responded to Defendants' motion questioning whether Defendants had evidence that the cited opt-in Plaintiffs actually worked in Nevada.  *See* Pls.' Resp. in Opp'n to Defs.' Mot. 14, ECF No. 195-3. Neither party cited to record evidence in their briefs regarding where any opt-in Plaintiffs worked during the collective action period, so I assume for purposes of reviewing the issue here that some opt-in Plaintiffs worked in Nevada and assess the arguments presented.

federal minimum wage) or $8.25 for employees not offered health benefits.  *See* Press Release, State of Nev. Dept. of Bus. & Indus., "Nevada's minimum wage and daily overtime rates will not increase in 2017," (Mar. 31, 2017), available at https://labor.nv.gov/uploadedFiles/labornvgov/content/Wages/2017%20Minimum%20Wage%20 Press%20Release.pdf.

In response, Plaintiffs attempt to create a genuine dispute of material fact by noting that Defendants did not show "that any of the Plaintiffs at issue worked for Metro Diner in Nevada; how Metro Diner paid the Plaintiffs at issue for their work . . . or whether Metro Diner required the Plaintiffs at issue to contribute part of the tips they received into a tip pool . . . ."  Pls.' Resp. in Opp'n to Defs.' Mot. 14, ECF No. 195-3.  Plaintiffs cite to these opt-in Plaintiffs' signed consent forms in response to receiving notice of the FLSA collective action suit.  These forms each say:

> By signing below, I state that I have been employed as a Server by Metro Diner Management, LLC, or one of its subsidiaries or affiliates ("Defendants"), since April 10, 2015 and hereby consent to join this lawsuit seeking unpaid overtime wages based on Defendants' alleged violations of the Fair Labor Standards Act, 29 U.S.C. s. 201, *et seq.*

ECF Nos. 94-1, 99-1, 102-1, 105-1, 110-1, 114-1, 106-1.

Plaintiffs ask me to infer that by signing the consent forms, the opt-in Plaintiffs endorse allegations in the Complaint as true.  The most relevant allegation is that "Defendants' pay Servers the tip-credit minimum wage rate for all of the hours they work."  Am. Compl. ¶ 17.

Under *Celotex*, the party moving for summary judgment need not prop the motion on supporting evidence – the party "may move for summary judgment '*with or without supporting affidavits*'." 477 U.S. at 323 (emphasis in original).  This is because the purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses" and pointing out

that the party bearing the burden at trial is unable to factually support its claims is a valid basis to move for summary judgment. *Id.* at 323-24. Furthermore, opposing the summary judgment motion will then "require[] the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324 (citing Fed. R. Civ. P. 56(e)).

Defendants point to an absence of factual support for the proposition that opt-in Plaintiffs who worked in Nevada, governed by Nevada state law, were paid a tip-credit minimum wage. This is a critical element of these Plaintiffs' claims because payment of a tip-credit minimum wage to comply with the FLSA triggers its protections; if a Plaintiff is paid the federal or state minimum wage, against which no tip credit was taken to comply with the FLSA's minimum wage obligations, then that Plaintiff is unable to sue the employer because there is no FLSA violation. *See Cumbie v. Woody Woo, Inc.*, 596 F.3d 577, 583 (9th Cir. 2010) ("[N]othing in the text of the FLSA purports to restrict employee tip-pooling arrangements when no tip credit is taken . . . ."); *see also Johnson v. Hakkasan Holdings LLC*, No. 215CV01410RCJNJK, 2016 WL 8608346, at *2 (D. Nev. Jan. 25, 2016) (citing *Cumbie*, 596 F.3d at 580-81 ("Only if an employer must count tips to make the minimum wage is tip sharing potentially problematic under the [FLSA].")). Therefore, if a Plaintiff were not paid a tip-credit minimum wage, then that Plaintiff would lack the requisite factual background to support these FLSA claims and no reasonable juror could find a FLSA 80/20 Rule or tip pool arrangement violation.

Plaintiffs' response fails to establish the existence of facts that would present this as a genuine issue for trial. Plaintiffs' reference to the signed consent forms fails to present *facts*; it is, once again, a reference back to the "mere pleadings" which will not create a genuine dispute

of material fact to defeat summary judgment. *Celotex*, 477 U.S. at 324. The opt-in Plaintiffs signed this consent form without averring to having been paid a tip-credit minimum wage; even though that was an allegation in the Complaint, the Complaint was not attached in its entirety to the consent forms as circulated among potential plaintiffs. Even taking the record in the light most favorable to the nonmoving party, there are no facts in the record to establish that these opt-in Plaintiffs were paid a tip-credit minimum wage. Insofar as any opt-in Plaintiffs worked in Nevada, I will grant Defendants' motion to dismiss them from the collective action on summary judgment.[16]

## IV. CONCLUSION

I will deny Plaintiffs' motion for summary judgment on the tip pool claim. As to the tip pool claim relating to Hosts, I will grant Defendants' motion for partial summary judgment. As to the tip pool claim relating to Bussers, I will deny Defendants' motion for partial summary judgment. I will deny Plaintiffs' motion on the 80/20 claim. I will grant Defendants' partial motion for summary judgment to dismiss CHG, John Davoli, Sr., and Mark Davoli as defendants, and dismiss some claims against MD Original. I will also grant Defendants' request to dismiss any Nevada opt-in Plaintiffs from the collective action.

 

 

 

 

    \_\_s/ANITA B. BRODY, J._____
            ANITA B. BRODY, J.

COPIES VIA ECF

---

[16] Upon investigating which opt-in Plaintiffs worked at a Nevada Metro Diner location and were therefore paid in accordance with Nevada state law, and not a tip-credit minimum wage, the parties will be expected to submit evidence relating to the employment of those opt-in Plaintiffs in Nevada at the Final Pretrial Conference.